OPINION
{¶ 1} Appellant Aimee Womack ("mother") appeals two July 25, 2006 judgment entries entered by the Stark County Court of Common Pleas, Family Court Division, which terminated mother's parental rights, privileges, and responsibilities in regard to two of her minor children, and granted permanent custody of the children to appellee Stark County Department of Job and Family Services ("the department").
 STATEMENT OF THE CASE AND FACTS {¶ 2} On June 28, 2005, the department filed a Complaint, alleging Katelynn Womack (DOB 4/22/02) and Kibwana Womack (DOB 8/22/03) were dependent and neglected children, and seeking temporary custody of the children. The complaint was based, in part, upon an incident which occurred on June 28, 2005, when the department learned mother had left the children with the maternal grandmother two days prior on June 26, 2005, and had not returned. Grandmother had left a detox program approximately two weeks earlier and was staying at the YWCA. Grandmother was in the detox program for crack cocaine use. Grandmother had no money to provide for the children, and the children had not eaten since lunch on June 27, 2005. Via Shelter Care/Pre-Disposition Judgment Entry filed June 30, 2005, the trial court placed the children in the emergency temporary custody of the department.
 {¶ 3} Mother appeared before the trial court on September 15, 2005, and stipulated to a finding of dependency with respect to both children. Father of Kibwana, Deogrativs Mwalujuwa, stipulated to a finding of dependency with respect to Kibwana. Frank Nichols, the alleged father of Katelynn, did not appear in court.[1] Kibwana's father filed a complaint for custody of both children. By stipulation, Kibwana was placed in the legal custody of his father.
 {¶ 4} The department filed a Motion for Permanent Custody with respect to Katelynn on May 9, 2006. The trial court scheduled a hearing on the motion for July 18, 2006. On May 16, 2006, the department filed a complaint for permanent custody relative to mother's newborn child, Alexi Asencio (DOB 5/14/06). The trial court placed Alexi in the shelter care custody of the department and scheduled a hearing on the motion for permanent custody relative to Alexi for July 18, 2006.
 {¶ 5} The following evidence was adduced at the hearing. Elizabeth Parsons, the ongoing family case worker assigned to the case, testified the department's initial concerns centered around the children's home conditions. The department found mother's home to be very dirty and lacking in certain utilities. The department also had concerns over domestic violence as well as substance abuse issues. At the time, mother was being evicted from her apartment.
 {¶ 6} Parsons explained mother's case plan included Goodwill Parenting, employment, housing, drug and alcohol services, a parenting evaluation and the establishment of paternity. After mother failed to appear for four appointments at Northeast Ohio Behavioral Health, the facility refused to see her. Mother presented for an assessment at Melymbrosia. She began the assessment, but missed several appointments. Mother finally completed the assessment in February, 2006, approximately nine months after such had been ordered. The department asked mother to complete a drug and alcohol assessment at Quest. Mother did not keep any appointments at Quest, but finally presented and completed an assessment at Renew on March 7, 2006, ten months after it was ordered. Mother signed up for Goodwill Parenting classes in late 2005, for a class which began on February 13, 2006. Mother was not permitted to start due to her noncompliance with drug and alcohol treatment and urine screens. Mother started the classes at the end of May, 2006, and was attending at the time of the hearing.
 {¶ 7} Parsons testified mother had a lot of issues of noncompliance with regard to her urine drops. Mother did not submit to the urine screens on the date asked of her until February or March of 2006. Prior to that, mother would wait three or five days after the request before dropping a specimen. Parsons explained the department did not consider this a valid screen. Mother had been employed since January, 2006. Although transportation was an issue for mother, mother never took advantage of bus passes available and provided to her by the department. Mother admitted to smoking marijuana while pregnant with Alexi. Despite Parsons advising mother Alexi's father, Dilmer Asencio, an illegal alien, was not permitted to reside in her home, mother permitted him to do so. Mother lied to the case workers and her counselor regarding Asencio's presence in her home. On July 10, 2006, the police removed him at gunpoint from his hiding place in mother's attic. Three days later, mother admitted Asencio was again in the home.
 {¶ 8} With respect to mother's visitation, Parsons noted initially mother was either late for or would leave early from the visits. Mother did not bring snacks for the children, and often left to buy food. Parsons added, in March, 2006, mother became consistent with her every other week visitation, and subsequently, with weekly visitation. Mother struggled during the early visits. She would sit, watch the children play, and give directions from a chair. As the visits went on, mother became more active, getting down and playing or reading or coloring with them. Parsons noted mother always depended upon Parsons or the visitation cites to provide activities for the children. Parsons inspected mother's home on July 10, 2006. Despite eight weeks of Goodwill Parenting classes, mother did not have the necessary supplies for the children. Parsons concluded mother has not reduced the risks to the children as her behaviors have not changed. Mother continued to expose herself to people were are unsafe and the conditions of her home were marginal at best.
 {¶ 9} Dr. Steve Dean, a psychologist and the clinical director of Melymbrosia Associates, testified the department referred mother to his agency for a psychological evaluation and also a parenting evaluation. When asked if he had any concerns in regard to mother's psychological testing, Dr. Dean stated the personality testing indicated mother has a difficult time following through with the normal responsibilities of life, tends to be impulsive, and does not give enough deliberation before acting. Dr. Dean added mother's judgment tends to be poor and she tends to find herself in the same situations time and again. When asked about the testing in regard to mother's parenting, Dr. Dean stated mother's test results indicated she lacked confidence in her parenting and such raised a question about her ability to be consistent with her daughter. Dr. Dean questioned mother's emotional connection to her daughter. As for the intelligence testing, Dr. Dean testified the results indicated mother has the sufficient cognitive ability to parent and has the capacity to do so if she chooses.
 {¶ 10} When asked his overall impressions of mother during the interview process, Dr. Dean responded, "Most notable for me was just completing the evaluation. I think that it was, took [mother] a number of times to get into the office, she missed one appointment, she was forty-five minutes late to another. I think she called for her initial appointment stating she couldn't find our office. So she seemed to have considerable difficulty even just managing the task of completing a psychological evaluation." Tr. at 72. Dr. Dean explained, if mother struggled to complete a basic psychological evaluation, he questioned whether she could handle the typical stresses which accompany being a parent. Dr. Dean recommended mother seek therapy, including anger management, attend parenting education classes, and submit to drug screens. Dr. Dean further recommended, if mother continued to be noncompliant, the department should filed for permanent custody. Dr. Dean gave mother a poor prognosis.
 {¶ 11} Robert McGuffin, a parenting instructor with Goodwill Industries, testified mother was in the ninth week of a twelve week program, and had completed eleven of twenty-four goals. McGuffin stated mother signed a behavioral contract on July 11, 2006, after she had four unexcused absences. McGuffin explained, if mother had one more unexcused absence, she would be terminated from the program. As part of the program, mother visits with the children. Mother is required to bring needed supplies and appropriate meals. According to McGuffin, the meals mother has provided have been "okay". Mother has brought fast food on one occasion and on two occasions provided soda, which Goodwill does not allow. Although mother is required to bring supplies, McGuffin recalled a few times the foster family had to provide the supplies. The week prior to the hearing, mother did not provide any supplies.
 {¶ 12} Kim Friley, an intake coordinator and therapist at Renew Counseling Services, testified she began individual therapy with mother in March, 2006. The focus of mothers counseling was her drug use, specifically, her marijuana use during her pregnancy, as well as her dependency issues. Throughout the counseling, mother reported she no longer had a relationship with Alexi's father and had not seen him since he was deported. As late as July 6, 2006, mother told Friley she liked having the house to herself and would not choose to be with Alexi's father as she was putting her children first. At the following session on July 13, 2006, Friley asked mother about father's presence in her house on July 10, 2006. Mother explained Alexi's father had only been there for a week. Friley explained mother's lies demonstrate mother is not committed to the children. Friley added mother's behaviors demonstrate an unwillingness to change, and the lies mother told Friley and her case worker actually showed an intent not to change.
 {¶ 13} Mother also testified at the hearing. She stated she had no explanation for why it took her so long to begin her case plan services, only that she "didn't think it was as serious as it was." She continued, "I didn't think it was going to end up like this, because at the time I didn't think I deserved to get my kids took away from me." Tr. at 57. When asked about her unexcused absences from the Goodwill Parenting program, mother stated things had come up and she knew she was permitted to miss up to four classes, so she took advantage of that. Mother admitted to using illegal drugs while she was pregnant with Alexi, but maintained she had not used any drugs since December, 2005. Mother acknowledged having a criminal conviction for assault after the instant case had commenced. Mother also admitted she drives an automobile although she does not have a driver's license or insurance.
 {¶ 14} The trial court proceeded to the best interest portion of the hearing. Elizabeth Parsons testified Katelynn and Alexi were currently in a licensed foster-to-adopt home and were doing very well. Katelynn has some significant speech delays and developmental delays. The department was waiting for a formal report from Akron Children's Hospital in order to make the necessary referrals. Parsons added Katelynn is bonded to the foster family and well adjusted to their home. Parsons had no concerns with respect to Alexi due to his age. Parsons believes there is a bond between mother and Katelynn, but thinks mother views Katelynn as a possession rather than a child. Parsons concluded a grant of permanent custody to the department would be in the best interest of the children as mother has demonstrated she cannot maintain any consistency or structure in her own life. She noted any harm which might result between breaking the bond between mother and the children would be outweighed by the positive as a grant of permanent custody would guarantee all of Katelynn's needs and her special needs would be met on a regular basis.
 {¶ 15} Via two separate Findings of Fact and Conclusions of Law filed July 25, 2006, the trial court found mother, despite the reasonable efforts of the department and her own recent efforts, had failed to reduce or eliminate the concerns which resulted in the initial removal of Katelynn and Alexi from her home. The trial court further found it was in Katelynn's and Alexi's best interest to place them in the permanent custody of the department. Via judgment entries filed July 25, 2006, the trial court terminated mother's rights and responsibilities in regard to the children and granted permanent custody to the department.
 {¶ 16} It is from the July 25, 2006 Findings of Fact and Conclusions of Law and the July 25, 2006 judgment entries mother appeals, raising the following assignments of error:
 {¶ 17} "I. THE JUDGMENT OF THE TRIAL COURT THAT THE MINOR CHILD CANNOT OR SHOULD NOT BE PLACED WITH APPELLANT IS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
 {¶ 18} "II. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILD WOULD BE SERVED BY GRANTING PERMANENT CUSTODY TO SCDJFS IS AGAINST THE SUFFICIENCY AND MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 19} This appeal is expedited and is being considered pursuant to App. R. 11.2(C).
 I {¶ 20} In her first assignment of error, mother maintains the trial court's findings Katelynn and Alexi cannot or should not be placed with mother was against the manifest weight and sufficiency of the evidence.
 {¶ 21} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment.Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence.C.E. Morris Co. v. Foley Constr. (1978), 54 Ohio St.2d 279, 376
N.E.2d 578.
 {¶ 22} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C.2151.414(A)(1) mandates the trial court must schedule a hearing, and provide notice, upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.
 {¶ 23} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned and the parents cannot be located; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 24} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.
 {¶ 25} If the child is not abandoned or orphaned, then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.
 {¶ 26} As set forth in the Statement of Case and Facts, supra, Elizabeth Parsons, the ongoing family case worker with the department, testified mother had not fully complied with her case plan. Mother had not started or completed many of the requirements on the case plan until at least six months after the initial removal of the children from her home. Mother's explanation for not immediately beginning case plan services was the fact she did not think the situation was serious. Mother lied to Parsons, Frileg, and McGuffin regarding her ongoing relationship with Alexi's father despite the fact he had been domestically violent toward her and she had been told not to permit him in her home. Mother's psychological evaluation indicated mother has difficulty following through with the normal responsibilities of life, tends to be impulsive, and does not give enough deliberation before acting. As a result, mother has poor judgment, and finds herself in the same situations time and again. Dr. Dean opined mother's prognosis to respond to his recommended treatment was poor due to her noncompliance with the case plan for eight months, and her difficulty in keeping appointments and completing her initial evaluation.
 {¶ 27} Based upon the foregoing, and the entire record in this matter, we find the trial court's findings Katelynn and Alexi cannot or should not be placed with mother was not against the manifest weight or sufficiency of the evidence.
 {¶ 28} Mother's first assignment of error is overruled.
 II {¶ 29} In her second assignment of error, mother contends the trial court's finding the best interest of the children would be served by granting permanent custody to the department was against the manifest weight and sufficiency of the evidence.
 {¶ 30} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
 {¶ 31} The record reveals four year old Katelynn suffers from significant speech and developmental delays, which require speech and occupational therapy. Katelynn's foster parents are working with her on a daily basis and following through with the recommendations from Akron Children's Hospital. Parsons expressed concerns regarding mother's ability to follow through with Katelynn's needed therapies when mother was unable to comply with her own case plan. Parsons further noted the children are in a foster to adopt placement and are doing well.
 {¶ 32} Based upon the foregoing, and the entire record in this matter, we find the trial court's determination it was in the best interest of the children to grant permanent custody to the department was not against the manifest weight or sufficiency of the evidence.
 {¶ 33} Mother's second assignment of error is overruled.
 {¶ 34} The judgment of the Stark County Court of Common Pleas, Juvenile Division, is affirmed.
By: Hoffman, P.J. Farmer, J. and Boggins, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas, Juvenile Division is affirmed. Costs assessed to appellant.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Stark County Court of Common Pleas, Juvenile Division is affirmed. Costs assessed to appellant.
[1] Neither father is a party to this appeal.